## Case No. 15,122.

### UNITED STATES v. FLOWERY.

[1 Spr. 109; 1 8 Law Rep. 258.]

District Court, D. Massachusetts. Aug., 1845.

EVIDENCE—CHAIN OF EVIDENCE—CONVERSATIONS—SLAVE TRADE—NEW TRIAL—CIRCUIT COURTS.

1. Facts which, if standing alone, would be irrelevant, are admissible in evidence, upon the statement of counsel, that they constitute a part of a chain of evidence, which, as a whole. would be relevant.

2. The court may direct at what part of such proposed chain of evidence the counsel shall begin.

3. It is no ground for a new trial, that incompetent evidence was admitted without objection.

4. It seems, that where there is evidence tending to show that several persons are combined together in carrying on an unlawful enterprise. such as the slave trade, the conversations of some of them, in relation thereto, in the absence of others. may be given in evidence against such others.

5. Where a witness, in his direct examination, had testified that a certain person was reputed to be a man of large property, counsel were permitted, in cross-examination, to ask in what such property was reputed to consist.

6. A new trial will not be granted, merely because counsel have been indulged in too great latitude in arguing. as to the inferences to be drawn from the evidence.

---

1 [Reported by F. E. Parker. Esq.. assisted by Charles Francis Adams. Jr., Esq., and here reprinted by permission.]

7. Whether circuit courts of the United States may be holden by the two judges in the same district, at the same time, in different rooms,—quære.

R. Rantoul, Jr., U. S. Dist. Atty.

J. P. Rogers and P. W. Chandler, for defendant.

SPRAGUE, District Judge. Peter Flowery was indicted under the statute of 1818 [3 Stat. 450], for causing a vessel, called the Spitfire, to sail from the port of New Orleans, with intent to employ her in the slave trade. The jury returned a verdict of guilty, and his counsel now move for a new trial, for several causes.

The most important, and that which has been pressed with the greatest earnestness, is, that evidence was admitted that the Spitfire, on a former voyage, carried a cargo of slaves from Rio Pongo to Cuba.

This was objected to, on the ground that Flowery had no connection therewith. The district attorney thereupon stated, that he should introduce evidence that Flowery had knowledge of such former voyage. It is now insisted that such evidence was not subsequently introduced, and that the testimony objected to should not have been admitted, upon the statement of the district attorney.

It is conceded to be the practice, in civil cases, to admit evidence under such circumstances; but it is urged that it ought to be otherwise in criminal cases. We know of no such distinction. The practice and the prinple, are the same in both. Where a chain of testimony is proposed, the links of which, unconnected, would be irrelevant, counsel must be allowed to begin somewhere, upon the expectation that the other links are to be afterwards supplied, and for this the court rely upon the statement of counsel, professional honor being a guaranty against abuse. But the order in which such evidence shall be introduced, is under the control of the court, who may direct the counsel to begin at any part of the proposed chain of evidence, as the purposes of justice may seem to require.

It is urged, that the court, after the evidence was closed, should have instructed the jury to lay this testimony out of the case.

In the first place, no such instruction was requested; and in the next, the evidence, subsequently introduced, justified the statement of the district attorney, upon which it was originally admitted, and rendered it proper to be submitted to the final consideration of the jury. The evidence tended to show, that the Spitfire was a schooner of about ninety-nine tons burden, built at Baltimore in the year 1841, and there registered in 1842, by the name of Caballera, as the property of one Gordon; that subsequently she was in the Rio Pongo, under his command, where a bill of sale of her was made to one Peter Faber, who had a

slave factory on that river, from which, under the command of Gordon, she carried a cargo of slaves to Cuba, and there landed them, and immediately Gordon delivered up the schooner to some Spaniards.

This was supposed to be about the month of May, 1843. The name of Caballera was erased from her counter, when she took on board the slaves. The next that we hear of her, is in September of the same year, when she was at Havana, under the command of Flowery, by the name of the Spitfire, bound, as the shipping-articles state, on a voyage to Key West, New Orleans, and back to Havana. She proceeded on this voyage, with one John Scosure on board, as a passenger. On her arrival at New Orleans, she was stated, in the shipping list, to be for sale, but was carried to the opposite side of the river, where she lay for several weeks, undergoing extensive repairs; both masts were taken out, and new ones put in; she was coppered, painted, and some new sails and rigging furnished. Afterwards, a bill of sale was made, purporting to be from one Falker, of Key West, by one Anquera, as his attorney at New Orleans, to Peter Flowery, in consideration of $7,500; and a charter-party was made between Flowery and Scosure, for a voyage from New Orleans to Havana, and thence to the Rio Pongo, for which Scosure was to pay $5,000. The vessel could not be registered as American, because she had been owned by foreigners. The bill of sale and charter-party appear to have been executed at New Orleans, on the 20th and 25th days of November, 1844, and she sailed from New Orleans on the 26th, for Havana, with Scosure on board as a passenger, and thence proceeded to Faber's factory, on the Rio Pongo, where she was seized.

There was testimony that she was originally constructed with eight places for sweeps, quarter-houses, and a trunk on deck, extending partly over the main hold, and partly over the cabin, with holes in the sides, nine by twelve inches, for ventilation, and that in a former voyage there had been a bulkhead in the hold, to divide the male from the female slaves. There was also evidence, tending to show that the name, Caballera, had been painted in black letters on the taffrail, and that Flowery, while at New Orleans, caused them to be painted over, so as to conceal them.

The question is not, whether all this proves that Flowery knew of the former voyage, but whether there is anything to be submitted to a jury on that point; and in our opinion there is.

Flowery resides in New York, and formerly commanded a vessel running between that place and Havana. Not long after the termination of the first voyage, he is found in command of the Spitfire, at Havana. When, and under what circumstances, did he become connected with this vessel, owned by foreigners? Were there not indications of

the business in which she had been engaged; the marks of the bulk-head in the hold, quarter-houses, row-locks, and especially the trunk on deck, peculiarly adapted to the slave trade, and to no other? Again, upon her arrival at New Orleans, why were such extensive repairs made upon a vessel, then only between two and three years old? If the purpose was to change her appearance, so that she should not be recognized on her reappearance on the African coast, we see a sufficient reason for the new masts, new sails, and new paint The importance of disguising her will be better appreciated, when it is recollected that her seizure was owing to her being recognized by Turner, who, having been mate on her former voyage, discovered her identity, notwithstanding the change she had undergone. Again, Flowery says that he became the purchaser of this vessel, at New Orleans, and gave the extraordinary price of $7,500. Would he have done this, without any inquiry into her previous history? And especially, would he have taken a bill of sale, declaring that she could not have the privileges of an American vessel, because she had been owned by a foreigner, without investigation? And further still, there was evidence that he not only knew of her former name, Caballera, but had himself caused it to be painted over and concealed. Upon the last point, there was, indeed, rebutting evidence of great force; but of the effect of the whole, it was the province of the jury to judge.

It is further urged by the learned counsel, that if Flowery knew of the former voyage, it has no legitimate bearing upon the question whether this was a slave voyage or not, and is, therefore, irrelevant. We are to bear in mind that there were two propositions to be maintained by the government, both of which were denied by the defendant; first, that this was a slave voyage, and, second, that he had knowledge of, and intended to employ the vessel in it, when he sailed from New Orleans. One question was, whether the sale to Flowery was real, or colorable. If Flowery knew that she had been engaged in the slave trade, and liable to forfeiture, would he, bona fide, have purchased her, and paid the exorbitant price of $7,500? The knowledge of the former voyage tended to show that this sale was fictitious, and in this, as well as in other respects, went to the question of scienter and intent.

The second ground upon which a new trial is asked, is the testimony of one Smith, as to a conversation at Faber's factory between Faber and a Spaniard and a Frenchman, who went from Havana in the Spitfire. To this it is sufficient to say, that the evidence was not objected to; and although we are of opinion that the testimony as to conversations between the Spaniard, Frenchman, and Flowery, on the outward passage, and the part acted by them would, under all the circumstances in evidence in the case, have been sufficient to have authorized its introduction, if it had been resisted, we do not think it necessary to dwell upon it.

The third ground is, that the district attorney was permitted to ask, in what the property of Scosure was reputed to consist.

The facts are as follows: One McLellan, a witness for the defendant, after testifying that he knew Scosure, and that he resided at Havana, was asked by the counsel for the defendant whether Scosure was a man of property? To which the witness answered that he was reputed to be a man of large property; that he was reputed to own property to the amount of three or four hundred thousand dollars. The defendant's counsel then asked him whether Scosure was reputed to own property in this country; to which the witness answered that he was, to the amount of a hundred thousand dollars.

The district attorney, in cross-examination, asked the witness in what the property of Scosure consisted; to which he replied, that he did not know. He then asked in what it was reputed to consist. This question was objected to. The court ruled that it might be put, in reference to the property of which the witness, in his direct examination, had testified that Scosure was reputed to be the owner. The district attorney then asked, whether Scosure was reputed to be the owner of cargoes of vessels. The witness inquired whether he was bound to answer. The defendant's counsel objected to the question, and it was not pressed.

The question put by the district attorney was proper, in order to test the correctness of the original statement made by the witness, and is clearly within the established principles and practice of cross-examination.

The two following grounds are, that the district attorney was permitted to argue to the jury that Scosure had been previously engaged in the slave trade, and that certain passports found on board the Spitfire, were obtained for the purpose of protecting her against seizure. The objection is merely that counsel was allowed too great latitude in arguing, as to the inferences to be drawn from the evidence. If this were so, we should not, for that reason alone, disturb a verdict, rendered upon ample testimony, and with which the judge who presided at the trial, is entirely satisfied.

The course of argument to be allowed, must rest in some degree, at least, upon the judicial discretion of the court. A line of argument, clearly unfounded or irrelevant, would not be permitted. But there are many cases, and especially those which are voluminous and complicated, in which it may well be presumed that counsel perceive bearings and applications of evidence, which are not at once apparent to the court; and when it is made a question whether the evidence tends to a certain conclusion, the views of counsel, in other words, his argument, must be heard, before the court can be called upon to decide. This will be in the presence of the jury, and

it will not generally be material, whether it be in form addressed to them, or to the court; but it will conduce to the convenience and despatch of business, that the argument should at once be addressed to the jury, and the court afterwards should give such instructions as they may deem proper.

But we think there was some evidence, slight perhaps, but still something before the jury, from which counsel might well be permitted to argue that Scosure had been engaged in the slave trade. But it has been urged that, if this fact were established, it would be immaterial and irrelevant. We do not think so. The defendant gave evidence that there was such a person as Scosure, possessing great wealth, in order to repel the suggestion that the charter-party was fictitious. Suppose they had been able to show that his business was a regular and legal course of trade between Havana and the Rio Pongo, would it not have been admissible, at least on the question of the scienter and intent of Flowery? And on the other hand, if the government could show that his business was the slave trade, between Havana and the Rio Pongo, it would be competent evidence to the same point.

As to the passports, it was contended, in behalf of the defendant, that they were perfectly innocent papers, intended merely for the personal protection of the individuals. On the other hand, it was insisted that the persons named in them, were not mere passengers, and that the passports were designed to conceal their true character, and prevent suspicions, if boarded by an American or English man of war, before reaching the Cape de Verde. That one of them was not a passenger, is certain; he was shipped as, and performed the duties of cabin-boy, throughout the voyage. The other two, a Spaniard and a Frenchman, performed most of the duties of mate, there being no person, in the shipping-articles, holding that station; they regularly stood watch, took observations, kept the run of the vessel, and marked her course, one on a French, and the other on a Spanish chart; and had books of navigation, in the French and Spanish languages, respectively. After arriving on the African coast, on seeing a British steamer, the Spaniard concealed certain papers and money, and the Frenchman, being in the boat, threw overboard a flag, appearing to be Spanish, declaring that, if the English found that, they would seize the vessel. On arriving in the Rio Pongo, both these persons went to Faber's slave factory, lived in his house, and were heard bargaining with him for a cargo of slaves. There was testimony that these two persons and Flowery, on the outward passage, had frequent conversations, in which they spoke of the voyage as a slave voyage; and of the amount they should make, if they succeeded in carrying a cargo of slaves to Cuba. All the passports were for persons going from Havana to the Cape de Verde, for which the Spitfire was cleared: yet she passed in sight of those islands, without touching.

We think this not only competent, but strong evidence, that the ostensible, was not the real purpose for which those passports were obtained; that the Spaniard and Frenchman, and the Spanish cabin boy, were represented as passengers, to prevent the suspicions that might arise, if they appeared to be a part of the crew of an American vessel; and that the district attorney had a right so to argue.

The last objection, rests on the supposition that there were two circuit courts, holden separately, by the two judges, at the same time. This is a mistake. Flowery was tried at the regular term holden by the district judge, by adjournment, in the usual manner, from day to day, in the court room. In the meantime the judge of the supreme court was, by agreement of parties, hearing a cause in another room. This was not intended to be a circuit court. No judgment or decree was passed. Had the result of the hearing called for any, it might have been, by consent of parties, afterwards entered in court. Upon this statement of the facts, the counsel, upon a suggestion from the bench, have forborne to press the objection; and we have no occasion to consider whether it be competent for the two judges to hold the circuit courts, in different rooms, at the same time, or not.

[The prisoner, after some remarks had been made by his counsel, was sentenced to five years' imprisonment in the common jail, and to pay a fine of $2,000.] [2]